**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOSE L., | ) |
| | ) |
|     **Plaintiff,** | ) |
| | )   No. 18 C 4904 |
|     v. | ) |
| | )   Magistrate Judge Jeffrey Cummings |
| ANDREW M. SAUL, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
|     **Defendant.** | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Jose L. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's claim for a period of disability and Disability Insurance Benefits ("DIB") under 42 U.S.C. §§ 416(i) and 423(d) of the Social Security Act. The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's decision to deny benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3). For the reasons stated below, Claimant's motion for summary judgment [14] is granted and the Commissioner's motion for summary judgment [26] is denied.

**I. BACKGROUND**

    **A.**     **Procedural History**

On August 19, 2015, Claimant filed a Title II application alleging a disability onset date of September 13, 2013. (R. 140). His claim was denied initially on November 25, 2015 and

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Jose L. as Claimant.

1

upon reconsideration on February 17, 2016. (R. 140). On June 27, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 140-150). The Appeals Council denied review on July 7, 2017, making the ALJ's decision the Commissioner's final decision. (R. 1). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in District Court.

B. **Medical Evidence**

1. **Evidence From the Medical Records**

Claimant was involved in an automobile accident on September 13, 2013 that resulted in elbow, back, muscle, neck, and joint pain. An MRI was carried out on September 25, 2013 that showed disc dessication at C4-C5, C5-C6, and C6-C7. Diffuse disc protrusion with an annular tear was present at C4-C5. A profuse disc protrusion with an annular tear was also found at L3-L4. Protrusion with spinal canal and neural foramina were present at L4-L5, with protrusion and facet joint hypertrophy at L5-S1. (R. 502-05). Claimant was further diagnosed with spondylolisthesis, lumbrosacral spondylosis, and lower back pain radiating down his legs on January 29, 2014 by Dr. Sean Salehi.[2] (R. 398-99). Five epidural injections followed during the year after Claimant's accident that provided minimal relief. (R. 397). Pain medications such as Norco and Soma were also prescribed. In addition, Claimant underwent physical therapy to help relieve his discomfort. (R. 414-32).

By May 21, 2014, Claimant's condition was such that Dr. Krysztof Siemionow recommended that he undergo a surgical spinal fusion to remedy the L5-S1 spondylolisthesis. (R. 475-77). Claimant declined to have the surgery, however, and continued treatment with pain

---

[2] Spondylolisthesis involves a slipping of a vertebra that ordinarily occurs at the base of the spine. It may be caused by spondylolysis, "which is a defect or fracture of one or both wing-shaped parts of a vertebra." https://www.webmd.com/back-pain/guide/pain-management-spondylolisthesis (last visited September 25, 2019).

2

specialist Dr. Anas Alzoobi to manage his pain. Dr. Alzoobi noted on May 8, 2015 that Claimant was unable to stand up straight and was positive for pain at 40 degrees of flexion, 10 degrees extension, and 15 degrees of lateral rotation. (R. 559). Claimant also sought treatment from pain specialist Dr. Yasser Alhaj-Hussein. Dr. Alhaj-Hussein stated on March 30, 2016 that Claimant continued to take Norco daily and complained of numbness and weakness in his legs. Claimant was doing "reasonably well" on Norco though he continued to have sharp and stabbing pain that was 8-9 out of 10 at its worst. (R. 732). Dr. Alhaj-Hussein again noted on June 22, 2016 that Claimant was doing well on Norco every six hours for breakthrough pain and the anti-inflammatory medication diclofenac. (R. 727). Norco continued to be prescribed to Claimant through the date of the administrative hearing. (R. 754).

### 2. Evidence From the State-Agency Experts

On November 24, 2015, state-agency physician Dr. Towfig Arjmand found that Claimant could perform medium work by carrying and lifting up to 25 pounds frequently and 50 pounds occasionally. He had an unlimited capacity for pushing and pulling, balancing, and climbing stairs. Claimant could occasionally balance, stoop, crouch, and kneel. (R. 105-07).

Dr. Bernard Stevens revised that finding at the reconsideration stage by determining that Claimant could only carry out light work. His February 15, 2016 report states that Claimant could only carry 10 pounds frequently and 20 pounds occasionally. Dr. Stevens also stated that Claimant could only occasionally balance and climb stairs. He otherwise agreed with Dr. Arjmand's findings that Claimant could occasionally stoop, crouch, and kneel. (R. 120-22).

### 3. Evidence From the Consulting Expert

Dr. Thomas Oryszczak examined Claimant at the SSA's request on November 11, 2015 and issued a report. Claimant told Dr. Oryszczak that he experienced daily lower back pain that

3

radiated through both legs.  Physical therapy and several epidural injections had not been helpful.
Claimant stated that he could only walk approximately five blocks and that sitting for too long
made his condition worse.  Dr. Oryszczak's examination showed that Claimant had a normal
range of motion in his lower extremities with normal muscle strength in both legs.  The doctor
noted that Claimant had a positive straight leg test on the left side at 80 degrees. [3]  Claimant also
had a normal range of motion and full flexion in his spine.  Dr. Oryszczak diagnosed Claimant
with chronic lower back pain, a partial articular fracture at L5, and a right superior articular
process fracture at S1.[4]  He concluded that Claimant would "have difficulty with prolonged
sitting, standing, prolonged periods of walking, and repetitive lifting or carrying of heavy
objects."  (R. 522-25).

### C. Evidence From Claimant's Testimony

Claimant appeared at an administrative hearing on April 12, 2017 and described a limited
range of activities due to his lower back pain.  Claimant told the ALJ that he could stand for two
to three minutes without pain and could sit for only 25 minutes at a time.  (R. 79).  He can only
drive for 30 minutes.  (R. 69).  Claimant can dress and bathe himself "at times" but periodically
requires assistance.  Claimant is able to do the dishes as part of his daily chores but cannot do
laundry.  (R. 81).  He described his pain at a level of six to seven out of ten every day.  (R. 84).
Multiple epidural injections had not been helpful in alleviating his discomfort.  (R. 74).
Claimant takes Norco pain pills up to five times a day to reduce his pain to the level of five out
of ten.  (R. 76).  Lack of movement exacerbates his condition.  (R. 74).  The ALJ noted that

---

[3] A straight leg raise test is used to determine if a person's lower back pain is due to a lumbosacral nerve root irritation.  https://www.ncbi.nim.nih.gov/books/MBK539717 (last visited September 23, 2019).

[4] An articular fracture is a break of the articular surface of a weight-bearing joint. https://www.ncbi.nim.nih.gov/pmc/articles/PMC2958270 (last visited September 24, 2019).

4

surgery had been recommended to Claimant. He explained, however, that the information packet given to him by his neurosurgeon notified him of risk factors such as death or possible paralysis. (R. 74).

**D.     The ALJ's Decision**

On June 27, 2017, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of September 13, 2013. His severe impairments at Step 2 were lumbar and cervical spine disc protrusions, spondylolisthesis, and lumbrosacral spondylosis. Claimant also had the non-severe impairment of a left elbow disorder. The ALJ found that none of these impairments met or medically equaled a listing at Step 3 either singly or in combination.

Before moving to Step 4, the ALJ determined that the record did not fully support Claimant's testimony concerning the severity and frequency of his symptoms. The ALJ also assessed the reports of the state-agency and consulting physicians. She gave "greater" weight to the reconsideration evaluation of Dr. Stevens than to Dr. Arjmand's initial evaluation. "Some" weight was given to Dr. Oryszczak's report. Based on these findings, the ALJ concluded that Claimant had the residual functional capacity ("RFC") to perform light work as that term is defined under 20 C.F.R. § 404.1567(b), except that he could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. Claimant could have occasional exposure to vibrations, hazards, and extreme cold. He could never climb ladders, ropes, or scaffolds.

The ALJ then concluded at Step 4 that Claimant's RFC would not permit him to perform any of his past relevant work as a construction worker. A vocational expert ("VE") told the ALJ

5

that jobs existed in the national economy for a person with Claimant's RFC. Based on that testimony, the ALJ found at Step 5 that Claimant was not disabled. (R. 140-50).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

6

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

B.  **Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will

affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the Commissioner's decision requires remand because the ALJ: (1) erred in evaluating Claimant's testimony, (2) incorrectly assessed Dr. Oryszczak's report, and (3) did not properly assess Claimant's RFC. Because the Court agrees with Claimant's first two arguments it only briefly addresses the RFC issue.

### A. The ALJ's Symptom Evaluation Requires Remand

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The ALJ began her discussion by stating that Claimant had only received conservative treatment for his symptoms. (R. 147). Treatment modalities for back pain such as physical

8

therapy and epidural injections are conservative in nature and can suggest that a Claimant's symptoms are not as limiting as he or she alleges. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014) (addressing epidural steroid injections). In this case, however, the ALJ failed to address two aspects of Claimant's care that were critical to an adequate evaluation of his treatment. First, conservative care is relevant to a symptom evaluation *if* a claimant is able to manage his or her impairments without requiring more aggressive measures. *See Geer v. Berryhill*, 276 F.Supp.3d 876, 887 (E.D.Wis. 2017) ("In some cases the resort to conservative treatment would warrant an inference that the underlying symptoms are not especially limiting, for example, if someone alleges crippling pain but takes only the occasional aspirin."). That reasoning assumes that conservative treatment has been successful but the record clearly shows it was unsuccessful in this case. Treating physician Dr. Sean Salehi stated that Claimant "has failed conservative treatment," (R. 399), and the ALJ herself acknowledged that conservative treatment "did not improve the claimant's symptoms." (R. 147). An ALJ cannot rely on the conservative nature of care to discount a claimant's testimony when the treatments he or she received did not work. *See Pickup v. Colvin*, 606 Fed.Appx. 430, 433 (10th Cir. 2015).

Second, an ALJ cannot cite conservative care to discount a claimant's testimony without first eliciting an explanation as to why he did not pursue more aggressive care and then account for it in the decision. *See* SSR 16-3p, 2016 WL 5180304, at *9 (stating that an ALJ may not "find an individual's symptoms inconsistent with the evidence in the record [for not following treatment recommendations] without considering possible reasons he or she may not comply or seek treatment consistent with the degree of his or her complaints"); *see also Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). Moreover, "the fact that treatment may be routine or conservative is not a basis for finding subjective symptom testimony unreliable absent discussion of the

9

additional, more aggressive treatment options the ALJ believes are available." *Moon v. Colvin*, 139 F.Supp.3d 1211, 1220 (D.Or. 2015).

The ALJ complied with the first part of this requirement by asking Claimant why he did not have the surgery that was recommended to him. He told her that he feared the operation because his doctor had given him a pamphlet stating that surgery could cause death or paralysis. (R. 74). The ALJ briefly noted at one point what Claimant stated, (R. 144), but in the symptom evaluation she only stated that he was "reluctant" to have surgery. (R. 147). Even when the ALJ's decision is read as a whole, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), that does not satisfy the ALJ's second obligation to consider if Claimant had good reason for declining aggressive treatment. *See* 20 C.F.R. § 404.1530 (stating that an ALJ is to consider whether a claimant has "good reason" for not following a doctor's treatment plan). That is especially true when a claimant faces painful or difficult treatments like surgery. Many courts have found that under those circumstances an ALJ must consider the reasonableness of the claimant's fear before construing the claimant's reluctance to pursue aggressive treatment against him. *See*, *e.g.*, *Nichols v. Califano*, 556 F.2d 931, 933 (9th Cir. 1977) ("A patient may be acting reasonably in refusing surgery that is painful or dangerous."); *Schena v. Sec. of Health and Human Servs.*, 635 F.2d 15, 19 (1st Cir. 1980) ("A reasonable fear may justify the refusal of treatment."); *Swanson v. Barnhart*, 190 Fed.Appx. 655, 657 (10th Cir. 2006); *Ridge v. Berryhill*, 294 F.Supp.3d 33, 60 n.12 (E.D.N.Y. 2018); *Scalzo v. Heckler*, 652 F.Supp. 530, 542 (D.R.I. 1987) (finding that a claimant reasonably refused spine surgery).

The ALJ never discussed this issue even though ample evidence was available in the record concerning Claimant's testimony. Indeed, surgeon Dr. Krzysztof Siemionow advised Claimant on the risks of surgery that he recommended at length:

10

> We talked about the risks of the procedure. The risks can be divided into approach related risks which in this particular case include a vascular risk from the anterior lumbar approach which would be performed by a general surgeon and the risk of retrograde ejaculation. He does understand that. Then there are instrumentation related risks such as placement of pedicle screws around neurovascular structures which can cause a neurologic deficit or a radiculopathy or pain or all of the above. We also discussed the risks of a pseudoarthrosis. I would be using bone morphogenetic protein in an on label application which would ensure that this risk is minimized however this is never a zero and he does understand that. We talked about adjacent segment degeneration and whether he had surgery or not the stresses in the lumbar spine are not distributed evenly and therefore he is at increased risk of adjacent segment degeneration in the future as a result of his current condition. . . . We talked about the risk of infection. We talked about the risk of cerebrospinal fluid leakage and the significance of that and we discussed how all of the above mentioned potential complications can result in a repeat trip back to the operating room. . . . I do feel that it would take him a full year to recover. I told him he has a 7/10 chance of being satisfied with the outcome of surgery potentially, even an 8/10 chance, however a 2-3/10 chance of surgery going perfectly well, him not developing any complications, and still being unsatisfied with the outcome.

(R. 476-77). This extended set of warnings about unsuccessful surgery, a "vascular risk," and a "neurological deficit" provided the ALJ with all she needed to consider if the fear that Claimant testified to was reasonable or not. Having overlooked it, she did not satisfy SSR 16-3p's directive to consider the reasons why Claimant refused treatment.

In addition, the ALJ failed to address for two other aspects of Claimant's surgery. Dr. Alzoobi noted on April 17, 2016 that Claimant "does not have . . . insurance" for the surgery that was recommended. (R. 729). "An inability to afford treatment is one reason that can provide insight into the individual's credibility." *Craft*, 539 F.3d at 679 (internal quotes and citation omitted). The ALJ did not explore that possibility. She also overlooked that Dr. Siemionow "recommended" surgery to Claimant but did not prescribe it or state that it was crucial to his recovery. (R. 475). An ALJ may not rely on a claimant's refusal to undergo recommended or suggested treatments in denying disability benefits. *See*, *e.g.*, *Aguirre v. Astrue*, No. ED CV 08-1176, 2009 WL 3346741, at *5 (C.D.Cal. Oct. 14, 2009) ("[I]t is improper to deny benefits on

11

the basis of declined surgery, when surgery is only a *suggested* rather than a *prescribed* course of treatment.") (emphasis in original); *Maxwell v. Astrue*, No. 1:11-CV-1509, 2012 WL 4035538, at *6-7 (E.D.Ca. Sept. 12, 2012).[5]

The ALJ also failed to adequately address Claimant's ADLs in her evaluation of his symptom testimony. She noted that Claimant testified that he could drive for 30 minutes; go to flea markets; dress and bathe himself (though he needed assistance at times); and could wash dishes. (R. 147). The ALJ acknowledged that these activities did not "solely support" the RFC of light work but were nevertheless "another factor" in her decision. (R. 147). That fails to build a logical bridge between the record and the ALJ's conclusion. If Claimant could only drive for 30 minutes – a limited activity that is consistent with his other testimony that he can only sit for 20 to 25 minutes – he almost certainly could not sit for up to six hours a day as light work requires him to do. There is also no logical connection between being able to wash dishes, dress, and bathe oneself and being able to carry out light work for eight hours a day, five days a week. *See Wates v. Barnhart*, 274 F.Supp.2d 1024, 1039 (E.D.Wis. 2003) ("There is no requirement in social security law that a person be unable to feed, groom, bath[e] or dress herself in order to be

---

[5] *Aguirre* and *Maxwell* rely on a series of precedents that themselves refer back to the Seventh Circuit's decision in *Cassiday v. Schweiker*, 663 F.2d 745 (7th Cir. 1981), which distinguished between "prescribed" and "recommended" treatments. *Id*. at 749 ("[T]reatment must be 'prescribed.' Recommendations, suggestions, and abstract opinions are not enough."). However, *Cassiday* involved the question of whether an individual who had already been found to be disabled should have her existing benefits terminated. The issue here is whether Claimant is disabled in the first instance. Notwithstanding this distinction, the Court agrees with *Aguirre* and *Maxwell* that the same reasoning applies to a symptom analysis. *Cassiday* involved an earlier version of 20 C.F.R. § 404.1518, which stressed the importance of treatment that had been "prescribed" by a treater: "An individual with a disabling impairment which is amenable to treatment to restore his ability to work shall be deemed to be under a disability if he is undergoing therapy *prescribed* by his treatment sources but his impairment has nevertheless continued to be disabling or can be expected to be disabling for at least 12 months." 20 C.F.R. § 404.1518 (1980) (emphasis added). SSR 16-3p similarly states that an ALJ's symptom analysis should consider whether "the individual fails to follow *prescribed* treatment that might improve his symptoms." 2016 WL 5180304, at *9 (emphasis added); *see also* 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment *prescribed* by your physician if this treatment can restore your ability to work.") (emphasis added).

disabled."). As the Seventh Circuit has explained, a person's ability to perform daily activities . . . does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citing cases). The ALJ must therefore explain the basis of her reasoning with care by linking the claimant's ADLs with her symptom evaluation.

The Commissioner concedes that the ALJ did not meet that standard in this case but argues that her oversight only constitutes harmless error because she "was well aware of plaintiff's activities." (Dckt. #27, at 12). The relevant issue, however, is not what the ALJ was aware of but what she actually stated in her ADL discussion. Even if evidence exists to support a finding, an ALJ is always required to do more than rely on substantial evidence – "the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

The ALJ tried to bolster her symptom evaluation by noting that Claimant did not experience any significant side effects from the Norco that he took to control his pain. That would be relevant to Claimant's testimony if he had told the ALJ that he had side effects that either prevented him from taking his medication or that otherwise interfered with his functioning. However, he told her that he did *not* experience any side effects from his pain medication. (R. 76). The Court is therefore unable to understand how the ALJ construed the absence of side effects to discount Claimant's testimony. The ALJ may have meant that the absence of side effects allowed Claimant to work at a greater pace than he claimed – though she did not say that was the case – because she also found that the amount of Norco that he took adequately controlled his pain. The ALJ placed significant stress on this issue and attempted to catch Claimant in a contradiction related to it: she noted that he testified that Norco did not relieve his

13

pain and then contrasted that with treatment entries stating that Claimant's pain medication was effective.

The ALJ cited only two treatment entries to support this alleged contradiction, (R. 145, 147), and they both state that Norco helped with Claimant's pain. (R. 719; 622 "The patient is controlled with medication at this point"). However, the ALJ failed to recognize that other entries contradicted this evidence. On March 30, 2016, for example, Claimant told Dr. Alhaj-Hussein that he had "sharp and stabbing" pain that was eight to nine on a scale of ten at its worst. (R. 732). On August 31, 2016, he told Dr. Yasser Alhaj-Hussein that he had "no relief" and "no improvement" on Norco. (R. 725). The ALJ was obligated to consider this line of evidence that was at odds with her claim that Norco was sufficient to relieve Claimant's pain. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").[6]

Furthermore, the ALJ failed to recognize that one of the two records that she cited undermined her inference that Norco controlled Claimant's pain. In particular, an October 25, 2013 entry by Dr. Alzoobi stated that Claimant's pain was "controlled at this point with Norco 10/325 mg." (R. 622). Dr. Alzoobi's note clearly indicates that he did not mean that Claimant was free of pain – or even that his pain was manageable. To the contrary, he stated in this same note that Claimant's "functional status is very limited *because of the pain*" and referred him for a surgery consultation due to his "moderate to severe . . . *pain*." (R. 622) (emphasis added).[7] A

---

[6] As part of that, the ALJ should also have considered whether Claimant's symptoms fluctuated over time. SSR 16-3p stresses that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms." 2016 WL 5180304, at *9.
[7] The record shows that Norco was given to Claimant for "breakthrough" pain. (R. 727). "Breakthrough pain is pain that comes on suddenly for short periods of time and is not alleviated by the patient's normal

person who is "very limited" by pain and requires surgery to alleviate it cannot be said to have his pain under control in the way that the ALJ implied. In addition, Dr. Alzoobi's note was made in the context of a follow up after Claimant's second – unsuccessful – epidural injection to treat his pain. The ALJ did not address why Claimant would have required a steroid injection if Norco had been as effective as she claimed.

At a minimum, Dr. Alzoobi's note presents an ambiguity about the severity of Claimant's pain and the degree to which his prescribed medication relieved it. If a medical entry is unclear, an ALJ may need "to obtain additional evidence or clarification when the medical source's report contains a conflict or ambiguity that must be resolved." *Norris v. Astrue*, 776 F.Supp.2d 616, 632 (N.D.Ill. 2011) (citing 20 C.F.R. § 404.1512(e)(1)); *see also Ynocencio v. Barnhart*, 300 F.Supp.2d 646, 655 (N.D.Ill. 2004) (stating that an ALJ errs when she fails "to clarify important ambiguities in the record, resolve conflicts, and obtain important medical information"). Since the ALJ did not recognize this ambiguity, she necessarily failed to resolve it. Remand is therefore required so that she can clarify this issue and restate the reasons for the symptom analysis.

### B. The ALJ Incorrectly Weighed Dr. Oryszczak's Report

Claimant argues that the ALJ erred by not evaluating Dr. Oryszczak's report more carefully and by not explaining why Claimant could sit for up to six hours a day when Dr. Oryszczak found that he would have difficulty sitting or standing for long periods of time. Dr. Oryszczak's November 11, 2015 report assessed a normal range of motion and muscle strength in Claimant's lower extremities; normal range of motion and flexion in his spine; but concluded

---

pain suppression management." https://www.theacpa.org/conditions-treatments/conditions-a-z/breakthrough-pain. (last visited September 20, 2019). Dr. Alzoobi may have meant that Norco controlled Claimant's breakthrough pain but that his non-breakthrough pain remained limiting.

15

that Claimant would "have difficulty with prolonged sitting, standing, prolonged periods of walking, and repetitive lifting or carrying of heavy objects." (R. 525). The ALJ gave "some" weight to the report but stated that Dr. Stevens's report deserved greater weight because it was more consistent with the record. (R. 148).

An ALJ must assign specific weights to the reports of medical experts. *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a treating physician cannot be implied[.]"). When a treating source opinion is not given controlling weight – and Claimant did not submit a treating source opinion – "the ALJ must explain the weight given to the consulting physician's opinion." *Turner v. Berryhill*, 244 F.Supp.3d 852, 859 (S.D.Ind. 2017) (citing 20 C.F.R. § 404.1527(e)(2)). The ALJ does so by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).[8]

The ALJ did not apply any of these factors to her evaluation of Dr. Oryszczak's report. Indeed, the Commissioner does not defend the ALJ's reasoning but claims instead that she would have reached the same RFC finding even if she had done so. The state-agency physician Dr. Stevens reviewed Dr. Oryszczak's report at the reconsideration stage and gave it "great" weight, including Dr. Oryszczak's statement that Claimant would have difficulty with prolonged sitting or standing. (R. 130-31). The Commissioner argues that since Dr. Stevens's assessment was

---

[8] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. § 404.1527c. For claims like plaintiff's that were filed before that date, the factors set out in 20 C.F.R. § 404.1527 continue to apply.

based on Dr. Oryszczak's report – and since the ALJ's RFC was based on Dr. Stevens's report – Dr. Oryszczak's report does not support greater restrictions than the ones that the ALJ assessed.

The Court disagrees with this reasoning. It is true that Dr. Stevens gave Dr. Oryszczak's report great weight and thought that it was consistent with his own RFC. The ALJ also based her RFC on Dr. Stevens's. The Commissioner overlooks, however, that the ALJ did *not* think that meant that Dr. Oryszczak's report supported the RFC. She gave his report "some" weight and said that Dr. Stevens's report was *more* consistent with the record. (R. 148). Contrary to the Commissioner's claim, therefore, the ALJ must have thought that Dr. Oryszczak's report was inconsistent with her RFC assessment. By claiming that no contradiction exists between the ALJ's RFC and Dr. Oryszczak's report, the Commissioner defends the ALJ's decision on grounds that the ALJ herself rejected. It is well established that the Commissioner may not make such arguments. *See*, *e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).

The Court does not address this issue further because neither the ALJ nor the Commissioner has explained what it was about Dr. Oryszczak's report that is at odds – or less consistent – with the medical record. That warrants remand in itself because, even if such evidence exists, an ALJ's "decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion." *Giebudowski v. Colvin*, 981 F.Supp.2d 765, 774 (N.D.Ill. 2013). Unlike Dr. Stevens, moreover, Dr. Oryszczyak examined Claimant and had first-hand knowledge of his physical condition. The regulations advise ALJs that they should generally "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). Remand is

17

necessary so that the ALJ can explain the basis of her reasoning more carefully and clarify the weight that should be given to Dr. Oryszczak's report.

### C. The ALJ Should Reconsider the RFC Assessment

Because the ALJ incorrectly evaluated Claimant's symptom testimony and did not adequately explain why Dr. Oryszczak's report only deserved "some" weight, she is required to restate the reasons that support the RFC assessment. As part of that evaluation, the ALJ should explain why Claimant can occasionally stoop as part of his work. The ALJ noted that some of Claimant's examiners found that he had a full range of motion. (R. 145). She overlooked, however, that two other doctors found that he had limited flexion. (R. 395, 398, 404). The ALJ cited to the record that includes these observations but she neither discussed the issue nor resolved the conflict between the different assessments of Claimants ability to stoop. *See Thorps v. Astrue*, 873 F.Supp.2d 995, 1005 (N.D.Ill. 2012) ("An ALJ . . . is not only allowed to, he must, weight the evidence, draw appropriate inferences from the evidence, and, where necessary, resolve conflicting medical evidence.").

## IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [14] is granted. The Commissioner's cross-motion for summary judgment [26] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) restate the reasons for the symptom evaluation, (2) restate more fully the reasons for the weight given to Dr. Oryszczak's report, and (5) explain the basis for the RFC with greater clarity.

                                                        _____
                                                        **Jeffrey Cummings**
                                                        **United States Magistrate Judge**

**Dated: January 17, 2020**